IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| McCABE HAMILTON & RENNY CO., LTD., | CIVIL NO. 07-00512 SOM/LEK |
| Plaintiff and Counterclaim Defendant, | ORDER CONFIRMING ARBITRATION AWARD |
| vs. | |
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 142, AFL-CIO, | |
| Defendant and Counterclaimant. | |

ORDER CONFIRMING ARBITRATION AWARD

I.      INTRODUCTION.

        Defendant International Longshore and Warehouse Union,

Local 142, AFL-CLO (the "Union"), moves to confirm the Final

Award ("Arbitration Award") issued by Arbitrator Keith W. Hunter

(the "Arbitrator") on September 4, 2007, in the arbitration with

Plaintiff McCabe Hamilton & Renny Co., Ltd. ("McCabe").  McCabe

seeks to vacate the Arbitration Award.  The court grants the

Union's motion to confirm the Arbitration Award.

II.     BACKGROUND.

        On January 9, 1988, McCabe hired both Frank Ruiz and

Leonard Drago as longshoremen.  Ex. 2 (attached to Plaintiff

McCabe's Countermotion to Vacate Arbitration Award (July 31,

2008) ("McCabe Countermotion")).  McCabe assigns new employees

identification numbers, also known as "bango numbers," in ascending numerical order.  A lower bango number thus usually represents a higher seniority.  Ex. 1 (attached to McCabe Countermotion) at 24-25, 67.  Employees hired on the same day draw numbers out of a hat to determine which is assigned the lower bango number.  Id. at 24.  Ruiz was assigned bango number 1023, and Drago was assigned bango number 1022.  Ex. 2 (attached to McCabe Countermotion).

There are eight wharf gangs, each with six employees. All wharf gangs perform the same type of work.  There is a day shift and a night shift, and the wharf gangs alternate between these two shifts.  Ex. 1 (attached to McCabe Countermotion) at 4, 35-36, 114.  Gang 53 and Gang 56 are on opposite work schedules; when Gang 53 is on night shift, Gang 56 is on day shift.  Id. at 45.  On May 9, 1994, Drago was transferred to Gang 56.  Id. at 72-73.  On October 10, 1995, Ruiz was transferred to Gang 56. Id. at 32, 72.

By early 2002, it was apparent that Ruiz and Drago had a "history of problems," many of which had gone undocumented or unreported.  There is evidence that Drago physically attacked Ruiz, as well as allegations that Drago aimed profane graffiti at Ruiz.  Arbitration Award (attached as Ex. 1 to Defendant Union's Motion to Confirm Arbitration Award (June 27, 2008) ("Union Motion")) at 11-12.  In February 2002, Ruiz filed a report with

the Harbor Police that said that Drago had threatened him, and that the threat was only one of a series of threats and harassing incidents by Drago.  Ex. 3 (attached to McCabe Countermotion).

After this incident, McCabe referred both Ruiz and Drago to the Employee Assistance Program ("EAP"), which had an anger management program that sought to resolve the conflict between Ruiz and Drago.  EAP recommended that Ruiz and Drago no longer work together.  Arbitration Award at 12; Ex. 1 (attached to McCabe Countermotion) at 9-10, 78.  McCabe met separately with Ruiz and Drago to discuss the EAP recommendation and learned that both Ruiz and Drago wanted to remain in Gang 56 and were willing to work together.  Arbitration Award at 12; Ex. 1 (attached to McCabe Countermotion) at 78.

Longshoremen positions with McCabe are covered by a collective bargaining agreement ("CBA") known as the Longshore Agreement.  The CBA governs the terms of employment between McCabe and the Union.  Ex. 1 (attached to McCabe Countermotion) at 3-4; Ex. 2 (attached to Union Motion).  Ruiz and Drago have two types of seniority--company seniority and gang seniority. Ex. 1 (attached to McCabe Countermotion) at 16-17.

The CBA addresses only company seniority.  Arbitration Award at 6-7.  Section 3.01 of the CBA defines company seniority as "the employee's length of continuous service with the

3

Employer."  Section 3.09 governs the determination of promotions based on seniority:

> In making promotions of employees within the basic work force to posted jobs for which application is made, the qualifications of the applicant shall be determined by all relevant factors such as merit, experience, knowledge, ability, attendance, physical and mental fitness.  If there is no material difference in such factors between individuals being considered for the vacancy, length of service will govern.  In making a promotion to a vacancy in a job for which the Employer has a sub-category, length of service of the sub-applicants able to perform the job will govern.

CBA at 4-5; see also Ex. 1 (attached to McCabe Countermotion) at 5-6.  The CBA does not mention bango numbers.  Ex. 1 (attached to McCabe Countermotion) at 78; CBA at 4-5.

Nor does the CBA expressly address seniority within a gang.  Gang seniority turns on length of service within a gang and position in the gang.  Arbitration Award at 7-8; Ex. 1 (attached to McCabe Countermotion) at 18-20, 24, 51, 77.  Within a wharf gang, there are four regular longshoreman, one leaderman, and one subleaderman.  The leaderman is in charge of the gang, assigns work, and is paid more than the other gang members.  Ex. 1 (attached to McCabe Countermotion) at 36, 52; see also Arbitration Award at 7 ("The Leaderman has first preference for what jobs he will do, as well as a role in directing what jobs others in the gang will do.  He also gets paid more.").  A leaderman position is posted for promotion throughout the

4

company, and preference is given to employees who have been in subleaderman positions, as a subleaderman is considered a subcategory for the leaderman position.  Ex. 1 (attached to McCabe Countermotion) at 5-7, 25, 74.

A subleaderman substitutes for the leaderman when the leaderman is absent and also receives leaderman pay on the days of substitution for the leaderman.  Arbitration Award at 7-8. There is no written guideline governing the selection of a subleaderman, and the leaderman has discretion to assign this position.  Ex. 1 (attached to McCabe Countermotion) at 5, 16, 25-26.  Generally, the leaderman selects a subleaderman based on an employee's length of time in the gang.  Id. at 17, 23.

In 2001, the Gang 56 subleaderman position became available, as both the leaderman and subleaderman were absent. At the time, Ruiz was the most junior member.  Three of the most senior members were absent, and the next two in line in terms of length of time in Gang 56—Drago and Brian Benitez—declined the position.  Arbitration Award at 8-9; Ex. 1 (attached to McCabe Countermotion) at 33.  Ruiz accepted the temporary subleaderman position, putting him ahead of both Drago and Benitez.  By November 4, 2002, the two employees ahead of Ruiz for the subleaderman position had left Gang 56, and Ruiz became the official subleaderman of Gang 56.  Arbitration Award at 9.

Ruiz valued being the subleaderman because he could act as leaderman whenever the leaderman was absent.  Ex. 1 (attached to McCabe Countermotion) at 34.  Ruiz enjoyed the responsibility and status afforded him when he was leaderman.  Arbitration Award at 9.

On August 27, 2004, Ruiz reported that his locker had been damaged, or "smashed in," allegedly by Drago.  A witness also reported Drago's involvement in the damage.  Ex. 1 (attached to McCabe Countermotion) at 49; Arbitration Award at 13.  Ruiz's locker had been "smashed in" several times before this incident, and there were other incidents of damage to Ruiz's property.  Ex. 1 (attached to McCabe Countermotion) at 49, 56; Arbitration Award at 13.  McCabe says that it investigated the August 27, 2004, incident, but could not determine the perpetrator.  Ex. 1 (attached to McCabe Countermotion) at 57.  According to Ruiz, however, McCabe failed to respond to two emails he sent asking that the incident be investigated.  Arbitration Award at 13.

In late 2004, angry about being given certain work assignments, Drago threatened a supervisor, Harris Kaapa.  Drago blamed his work situation on Ruiz's absenteeism.  Ex. 1 (attached to McCabe Countermotion) at 11; Arbitration Award at 14.  Drago was sent to a twenty-week anger management course and suspended for a brief period.  Arbitration Award at 14.

In December 2004, McCabe met with Ruiz to address Ruiz's absenteeism, which McCabe viewed as angering Drago. Ex. 1 (attached to McCabe Countermotion) at 11, 18-19, 41. From January to April of 2005, Ruiz had thirty-three absences. Id. at 40. Ruiz was suffering from health problems during this time period, and the absences he took were permitted under the CBA, either as allowable sick days or vacation days. Id. at 20-21, 42. McCabe never sought to formally discipline Ruiz for his absences under the CBA. Arbitration Award at 14-15.

Drago complained that Ruiz's absences continued. McCabe determined that the situation would not improve and, in an attempt to diffuse the problem, transferred Ruiz to Gang 53 on May 7, 2005. Id. at 12-13, 28; Ex. 5 (attached to McCabe Countermotion). McCabe claims that it could not determine whether Drago or Ruiz was responsible for the workplace violence and based its decision on company seniority. According to McCabe, Drago's lower bango number made Drago senior to Ruiz, even though both were hired on the same day. Ex. 1 (attached to McCabe Countermotion) at 23, 61. As a result of the transfer, Ruiz lost his subleaderman position. Arbitration Award at 15.

Asserting that the transfer to Gang 53 caused "[s]tress, anxiety, and depression," Ruiz went on sick leave from approximately May 9, 2005, to May 15, 2006. Ex. 1 (attached to McCabe Countermotion) at 47. On May 23, 2005, the Union filed a

7

grievance on behalf of Ruiz, alleging that McCabe had discriminated against Ruiz by transferring him to Gang 53.  The Union characterized the transfer as a demotion because the transfer cost Ruiz his subleaderman position.  Ex. 2 (attached to Union Motion).

On February 2, 2006, in response to Ruiz's grievance, McCabe decided to compensate Ruiz as a subleaderman whenever the leaderman in Gang 53 was absent.  Nevertheless, because there was already a subleaderman in Gang 53, Ruiz did not act as a subleaderman.  Ex. 6 (attached to McCabe Countermotion); Ex. 1 (attached to McCabe Countermotion) at 29-30.  As the most junior member in Gang 53, Ruiz had "rookie status" and no priority in the selection of jobs.  Arbitration Award at 15.  Even after Ruiz's transfer to Gang 53, Drago continued to harass Ruiz and damage Ruiz's personal property.  Id. at 16.

On July 20, 2006, Ruiz obtained a restraining order against Drago from the District Court of the First Circuit of the State of Hawaii ("Restraining Order").  Ex. 8 (attached to McCabe Countermotion).  The Restraining Order enjoined Drago from "[c]ontacting, threatening or harassing" Ruiz and also prohibited Drago from "intentionally be[ing] within ten feet of [Ruiz] at any time."  Id. at 2.  The Restraining Order expires on July 20, 2009.  Id.

In early 2007, the Union and McCabe arbitrated the grievance over Ruiz's transfer.  Arbitration Award at 3.  Section 24.09 of the CBA sets forth the arbitrator's authority and limitations:  "All decisions of the Arbitrator shall be limited to the express terms and provisions of this agreement, shall be final and binding upon the parties hereto, shall be in writing, and a copy thereof shall be submitted to each of the parties hereto."  CBA at 24.

During arbitration, the Union argued that McCabe had violated the CBA and its own workplace anti-violence policy ("Workplace Violence Policy") by removing Ruiz from his subleaderman position and transferring him to Gang 53.  The Union characterized the transfer as a demotion designed to discipline Ruiz for his poor attendance record.  The Union argued that this demotion did not comply with the disciplinary provisions of the CBA.  Arbitration Award at 2-3.

Section 16.01 of the CBA provides, "Employees shall be subject to discipline or discharge by the Employer for insubordination, pilferage, drunkenness, incompetence, failure to perform work as required, violation of the terms of this agreement or failure to observe safety rules and regulations, and the Employer's house rules which shall be conspicuously posted."  CBA at 19.  McCabe must immediately notify the Union of any suspension or discharge and provide a written reason for the

9

discharge or discipline to any employee who so requests.  Id.
The Union sought, among other things, reinstatement of Ruiz to
the subleaderman position in Gang 56.

McCabe claimed that it transferred Ruiz to diffuse a
longstanding workplace violence situation between Ruiz and Drago.
McCabe said the transfer was allowed by the CBA provision giving
McCabe the right to transfer employees from one gang to another:

> 1.  Men will continue to be called as ship
> gangs of fourteen (14) men or wharf gangs of
> six (6) men plus special assignments now in
> effect.  The men called in gangs, on
> reporting for the job or when reporting to
> the job will continue to be reallocated in
> groups or gangs, depending on the manning
> required for the commodities to be handled.
> It is understood that in order not to employ
> unnecessary manpower on the job, the men may
> be transferred from ship to wharf, from wharf
> to ship or from one job to another.  Men so
> transferred may be added to or taken from any
> gang and shall work as directed by the
> leaderman or foreman of the gang assigned to.
> . . .
>
> 2.  Gangs or men assigned to any work at the
> start of a shift or operation may continue to
> be transferred to other assigned work by gang
> or individual, including fill-in, at any time
> and from time to time during the shift or
> operation.
>
> . . . .
>
> 6.  In the performance of wharf or ship work,
> men may be transferred from one gang to
> another, depending on the operation, at the
> option of the Employer and shall work under
> the direction of the foreman or leaderman of
> the gang transferred to.

CBA at C-2.

In his Arbitration Award, Arbitrator Hunter ordered
McCabe to restore Ruiz to his subleaderman position in Gang 56.
Arbitration Award at 28-29.  First, the Arbitrator concluded that
Ruiz's transfer to Gang 53 constituted a demotion because it cost
Ruiz his subleaderman position and "deprived him of the benefits"
associated with that position.  Id. at 21.  The Arbitrator
recognized that McCabe had "wide discretion in making" transfer
decisions but concluded that that discretion "does not provide an
avenue for the Company to take action that effectively punishes
an employee without meeting the disciplinary requirements of the
CBA."  Id. at 20.  There was no dispute that McCabe failed to
comply with the procedural or substantive requirements for
disciplinary action under the CBA.  The Arbitrator concluded that
Ruiz "was demoted in breach of the terms of the CBA."  Id. at 18-
19.

Second, the Arbitrator concluded that there was no
support for McCabe's contention that its transfer of Ruiz was
based on seniority.  Arbitrator Hunter noted that Ruiz and Drago
had the same company seniority, and that Ruiz held a higher
position than Drago in terms of gang seniority.  Id. at 21-22.
In doing so, the Arbitrator cited to section 3.01 of the CBA,
which defines seniority simply as the "length of continuous
service" with McCabe.  The Arbitrator also determined that McCabe
had failed to establish that it had a practice of using bango

11

numbers to determine seniority "among employees with the same length of service." Id. at 22.  In declining to accept McCabe's purported reason for transferring Ruiz, the Arbitrator noted that McCabe may have considered Ruiz's poor attendance in making its decision.  Id. at 16 ("[T]he Company's correspondence in the grievance process also referenced Ruiz' 'poor attendance in a leadership position', suggesting that this informed its decision, at least in part, to remove Ruiz from Gang 56.").

Third, the Arbitrator determined that McCabe had violated its Workplace Violence Policy by not taking "reasonable measures to protect [Ruiz] from workplace violence." Id. At 28. The Workplace Violence Policy states:

> All complaints of intimidation, harassment, assault, or threats of violence will be investigated promptly and will be kept confidential to the extent possible.  Any employee who is found after appropriate investigation to have engaged in any intimidation, harassment, assault, or threat of violence to another employee, customer, or third party will be subject to appropriate disciplinary action, up to and including termination.

Arbitration Award at 23.  The Arbitrator noted, "While the Arbitrator should, and will, refrain from second guessing the wisdom of the Company's management decisions, and should be wary of dissecting the wisdom of factual determinations made by the Company, the Arbitrator is less restrained when the questions involve the Company's understanding and/or application of a zero

tolerance Workplace Violence Policy." Id. at 25.  Examining

evidence suggesting that Drago had repeatedly been violent and

that McCabe's investigations of the violence had been limited,

the Arbitrator concluded that McCabe had failed to respond

appropriately to Drago's conduct.  Id. at 16-17; 26-28.

The Union now moves to confirm the Arbitration Award,

while McCabe countermoves to vacate the Award.  McCabe argues

that the Arbitration Award fails to draw its essence from the CBA

because the Arbitrator disregarded McCabe's "discretion to

transfer longshore employees between gangs at its option."

McCabe Countermotion at 3.  In the alternative, McCabe argues

that enforcement of the Arbitration Award would violate public

policy, as it would require McCabe to disobey the Restraining

Order.  Id.  The court concludes that the Arbitrator's decision

drew its essence from the CBA and that McCabe does not show that

enforcement of the Arbitration Award would violate public policy.

Accordingly, the court denies McCabe's countermotion and confirms

the Arbitration Award.

III.     LEGAL STANDARD.

As this court stated in an order involving a different

dispute between McCabe and the Union, see Order, Civ. 06-00514

SOM/LEK (Mar. 31, 2008) at 10-13,  this court's review of

arbitration awards is extremely limited, and courts give such

awards great deference.  See Haw. Teamsters & Allied Workers

13

Union, Local 996 v. United Parcel Serv., 241 F.3d 1177, 1180 (9th
Cir. 2001) ("Our review of labor arbitration awards is, however,
extremely deferential because courts do not sit to hear claims of
factual or legal error by an arbitrator as an appellate court
does in reviewing decisions of lower courts." (internal citations
and quotations omitted)); see also Stead Motors of Walnut Creek
v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1205 (9th Cir.
1989) (en banc).  An arbitration award is entitled to great
deference "[b]ecause the parties have contracted to have disputes
settled by an arbitrator chosen by them rather than by a judge,
[and] it is the arbitrator's view of the facts and of the meaning
of the contract that they have agreed to accept." United
Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29,
37-38 (1987).

    "As long as the award 'draws its essence' from the
contract, meaning that on its face it is a plausible
interpretation of the contract, then the courts must enforce it."
Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison
Indus., Inc. of Ariz., 84 F.3d 1186, 1190 (9th Cir. 1996).  See
also Sunshine Mining Co. v. United Steelworkers of Am., AFL-CIO,
CLC,  823 F.2d 1289, 1293 (9th Cir. 1987).  In other words, this
court's "task is to determine whether the arbitrator interpreted
the collective bargaining agreement, not whether he did so
correctly."  Haw. Teamsters, 241 F.3d at 1178.  See also Major

14

League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam) ("Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. . . . [I]f an arbitrator is even arguably construing or applying the contract . . . the fact that a court is convinced he committed serious error does not suffice to overturn his decision." (internal quotations and citations omitted)).

The Ninth Circuit has recognized only three narrow exceptions to the general rule of deferring to an arbitrator's decision: 1) when the arbitrator's award does not draw its essence from the CBA; 2) when the arbitrator exceeds the boundaries of the issues submitted to him; and 3) when the award is contrary to public policy.  United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms, 74 F.3d 169, 173 (9th Cir. 1995).

IV.      ANALYSIS.

McCabe argues that the Arbitration Award does not draw its essence from the CBA because the Arbitrator "ignored the CBA's plain language authorizing Company transfers and is based on his personal sense of industrial justice."  McCabe Countermotion at 25.  McCabe also argues that the Arbitrator's decision violates public policy because it requires McCabe to

15

intentionally violate the Restraining Order.   Id. at 26.   McCabe
is unpersuasive on both points.

        The court concludes that the Arbitrator did not ignore
the plain language of the CBA and instead plausibly interpreted
the CBA, not basing the Arbitration Award on his own sense of
justice.   The court also concludes that McCabe fails to establish
that enforcement of the Arbitration Award would violate public
policy.

        A.   The Arbitration Award Draws Its Essence from the
             CBA.

        An arbitrator's award draws its essence from the
contract if the arbitrator is even arguably construing or
applying the contract.   Eastern Associated Coal Corp. v. United
Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000).   If the
arbitrator's award "represents a plausible interpretation of the
contract, judicial inquiry ceases and the award must be
enforced."   George Day Constr. Co. v. United Bhd. of Carpenters,
722 F.2d 1471, 1477 (9th Cir. 1984).   In Hawaii Teamsters, the
Ninth Circuit clarified that an arbitrator's dispensing of "his
own brand of industrial justice" does not constitute an
independent ground for vacating an arbitrator's award.   It is
simply another formulation of the general rule that an arbitrator
must base his decision on a plausible interpretation of the
collective bargaining agreement.   See Haw. Teamsters, 241 F.3d at
1183 (citing Enter. Wheel & Car Corp., 363 U.S. at 597).   By

16

contrast, an arbitrator's award does not draw its essence from an agreement in "those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract."  Stead Motors, 886 F.2d at 1206-06 n.6.

An arbitrator's award does not draw its essence from an agreement when the arbitrator determines that a specific provision of the collective bargaining agreement applies, but then declines to apply the plain language of that provision.  In United Food & Commercial Workers Union, Local 1119 v. United Markets, Inc., 784 F.2d 1413 (9th Cir. 1986), the collective bargaining agreement provided that an employer found to have twice violated a certain provision regarding employment classifications was "no longer" entitled to use a "General Clerk" classification.  Id. at 1414.  In applying that provision, the arbitrator concluded that the employer had violated it on two occasions but permitted the employer to continue using the General Clerk classification.  The arbitrator further stated that the employer would lose the classification only after a third violation.  Id.  Affirming the district court's decision to vacate the award, the Ninth Circuit noted that the arbitrator's statement--that a third violation by the employer would result in the loss of use of the classification--was in "direct conflict" with the provision stating that two violations would result in loss of the classification.  Id. at 1415-16.  The arbitrator's

17

decision did not draw its essence from the agreement because, in applying a certain provision of the agreement, he ignored that provision's plain language.

Similarly, in Pacific Motor Trucking Co. v. Automotive Machinists Union, 702 F.2d 176 (9th Cir. 1983), the Ninth Circuit affirmed the district court's decision to vacate an arbitration award when an arbitrator, in applying a specific provision of an agreement, declined to apply the plain language of that provision.  In Pacific Motor, the arbitrator looked to a provision of a collective bargaining agreement that gave the employer discretion to fill the "Working Foreman" position without regard to seniority.  In applying that provision, the arbitrator ruled that the employer should not have removed the grievant from the Working Foreman position given the grievant's "incredibly long time" on the job.  Because the award "directly conflicted" with the provision the arbitrator was applying, the Ninth Circuit concluded that vacatur was warranted.  Id. at 177.

On the other hand, the Ninth Circuit has held that an arbitrator's decision draws its essence from the collective bargaining agreement when an arbitrator decides to apply one provision of the agreement over another.  In Virginia Mason Hospital v. Washington State Nurses Association, 511 F.3d 908 (9th Cir. 2007), the employer cited to three provisions of its collective bargaining agreement--the patient care priority

18

clause, the management rights clause, and the zipper clause--to argue that it had the authority to implement a mandatory immunization policy without first conferring with the nurses' union.  The arbitrator disagreed.  In looking at the provisions cited by the employer, the arbitrator decided that the provisions did not apply to the circumstances of the case.

The Ninth Circuit affirmed the district court's confirmation of the arbitrator's award, noting that "[t]he arbitrator did not ignore the plain language of the any of these clauses" when he decided that they were inapplicable to the situation before him.  "The arbitrator acknowledged the hospital's arguments based on all three of these clauses but simply found them unpersuasive.  Therefore, the arbitrator's decision was not procedurally unsound because of a failure to apply relevant provisions of the CBA."  Id. at 914.  See also Foster Poultry Farms, 74 F.3d at 172-74 (noting that the arbitrator's award drew its essence from the collective bargaining agreement when the arbitrator concluded that the employer's decision to unilaterally implement a random drug testing policy did not fall within the employer's "right to manage its business and direct its work force" set forth in the collective bargaining agreement).

Like the arbitrators in Virginia Mason Hospital and Foster Poultry Farms, Arbitrator Hunter simply decided that the

19

provision that McCabe relied on was inapplicable and that other provisions of the CBA applied to Ruiz's situation.  See Arbitration Award at 20-22.  Arbitrator Hunter acknowledged McCabe's discretion to transfer longshoremen between gangs but decided that, in this case, McCabe was attempting to use this discretion as a means of disciplining Ruiz without meeting the CBA's substantive and procedural requirements for discipline. See Arbitration Award at 20 (noting that McCabe cannot use its transfer discretion "to take action that effectively punishes an employee without meeting the disciplinary requirements of the CBA").  In other words, the Arbitrator interpreted the CBA and decided that the CBA's discipline, seniority, and attendance provisions applied, rather than the provision giving McCabe general discretion to transfer employees between gangs.  The Arbitrator's decision presents a plausible interpretation of the CBA, and this court does not question the correctness of that interpretation.  See Desert Palace, Inc., v. Local Joint Executive Bd. of Las Vegas, 679 F.2d 789, 793 (9th Cir. 1982). In declining to apply the provision regarding McCabe's discretion to make gang assignments and preferring instead to apply provisions governing disciplinary action, attendance, and seniority, the Arbitrator's decision drew its essence from the CBA.

McCabe points out that nothing in the CBA limits its discretion to make gang assignments.  Even if McCabe's transfer authority is not expressly limited in the CBA, situations will clearly arise in which provisions of the CBA may conflict with each other.  When conflicts between provisions of the CBA occur, it is the arbitrator's role to resolve competing interpretations of the CBA.  See Garvey, 532 U.S. at 509.  That is what Arbitrator Hunter did here.  The CBA is as silent with respect to limitations on the disciplinary provisions as it is with respect to limitations on McCabe's transfer authority.  Accordingly, the Arbitrator's decision to apply the disciplinary provision over the transfer provision in the CBA is a plausible interpretation of the CBA.

Alternatively, the Arbitrator's decision to apply one provision over another can be characterized as flowing from a factual finding that McCabe's real reason for transferring Ruiz was to discipline him for absenteeism.  Garvey is on point here. In Garvey, the Supreme Court upheld an arbitrator's award that determined that certain provisions did not apply to the factual circumstances of the case.  In Garvey, the Major League Baseball Players Association ("Association") had designed a "Framework" to evaluate baseball players' claims that they had lost contracts because the Major League Baseball Clubs had colluded among themselves.  Under the Framework, a player's claim was valid only

21

when there was evidence that a club had made an offer to extend a player's contract before the collusion but withdrew the offer after the collusion scheme went into effect.  Garvey, 532 U.S. at 506.  The arbitrator's role was to determine whether the Association had properly applied the criteria set forth in the Framework to a player's claim.

The Association denied a claim submitted by player Steve Garvey because Garvey failed to present evidence that an offer of extension had been made.  Garvey then submitted his claim to arbitration.  During the arbitration hearing, Garvey testified that the Padres had offered to extend his contract for the 1998 and 1989 seasons, but then withdrew the offer after the Padres allegedly began colluding with other teams.  Garvey also offered a 1996 letter written by the Padres' President and CEO, Ballard Smith, that supported Garvey's testimony.  Id.  After seeking additional documentation from the parties, the arbitrator denied Garvey's claim, based on his finding that Smith's 1996 letter was inconsistent with earlier testimony by Smith and therefore not credible.  The arbitrator then denied Garvey's claim, concluding that Garvey had failed to establish that the Padres had ever made an offer of extension.  Id. at 507.

Garvey moved to vacate the award in federal district court, and the district court denied Garvey's motion.  The Ninth Circuit reversed, concluding that Garvey had demonstrated that he

had been given an offer that was subsequently withdrawn because of the collusion scheme.  The Ninth Circuit took issue with the arbitrator's decision not to credit Smith's letter and also determined that the arbitrator should not have denied Garvey's claim based on the absence of other corroborating evidence.  Id. at 508.

The Supreme Court reversed, finding that the Ninth Circuit had vacated the arbitrator's decision based on its disagreement with the arbitrator's factual findings.  Id. at 510. The Court noted that it is the arbitrator's role to "resolve[] disputes regarding the application of a contract."  Thus, when "no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award."  Id. at 509 (quoting Misco, 484 U.S. at 39).  The Court concluded that the Ninth Circuit had no basis for overturning the arbitrator's decision "where, as here, he is construing a contract and acting within the scope of his authority."  Id. at 510.

Just as the arbitrator in Garvey did not find Smith's letter credible, the Arbitrator here did not find credible McCabe's explanation that it transferred Ruiz based on company seniority.  This, coupled with evidence of McCabe's dissatisfaction with Ruiz's attendance record, led the Arbitrator to conclude that McCabe transferred Ruiz to discipline him.  The

23

Arbitrator made a factual finding that McCabe had disciplined Ruiz. As a result, the Arbitrator applied the disciplinary provision of the CBA. As the Court emphasized in Garvey, it is not the role of this court to question the Arbitrator's factfinding.

In reaching his decision, Arbitrator Hunter also looked to McCabe's Workplace Violence Policy. McCabe argues that the Arbitrator's reliance on the Workplace Violence Policy was impermissible because the CBA limits the Arbitrator's decision "to the express terms" of the CBA, and the Workplace Violence Policy is not an express part of the CBA. See CBA at 24. This argument fails for two reasons.

First, in the Arbitration Award, the Arbitrator advanced three reasons for his decision to order reassignment of Ruiz to Gang 56, only one of which cited to the Workplace Violence Policy. An arbitrator's decision can be upheld even if the arbitrator relied on multiple theories, one of which exceeds the scope of the arbitrator's authority. See United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597-98 (1960). Significantly, even though the Arbitrator cited to the Workplace Violence Policy, he also cited to other provisions of the CBA. Thus, the Workplace Violence Policy was simply one component that informed the Arbitrator's decision, and the Arbitrator looked to

24

the Policy in reconciling the competing obligations in the CBA triggered by the circumstances of Ruiz's transfer.

Second, the Arbitrator may have plausibly interpreted the CBA as permitting him to consider implied provisions of the CBA.  Section 24.09 of the CBA limits the Arbitrator's decision to "the express terms and provisions of this agreement."  It is not at all clear that the word "express" defines "provisions," and the Arbitrator may have read "express" as defining only "terms."  In any event, the Arbitrator was certainly allowed to look to matters outside the CBA to inform his interpretation of the CBA.  "An arbitrator is not . . . limited to the four corners of the CBA in interpreting its terms." Virginia Mason Hosp., 511 F.3d at 915; see also Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, 989 F.2d 1077, 1081 (9th Cir. 1993).  The arbitrator can also look to the "industrial common law--the practices of the industry and the shop--[which] is equally a part of the collective bargaining agreement although not expressed in it." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960).  In fact, the arbitrator "is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment." Id. at 582.

25

Under this reasoning, the Arbitrator was justified in relying on the Workplace Violence Policy.

In Virginia Mason Hospital, the arbitrator concluded that the employer had a duty to bargain with the nurses' union over the terms and conditions of employment even though this obligation was not explicitly stated in the CBA.  The Ninth Circuit affirmed the district court's confirmation of the award: "When an arbitrator uses his knowledge of the industrial common law to infer a requirement from a CBA where the CBA is silent on that particular point, . . . the arbitrator is not adding new terms to the agreement but is simply finding the inferred term already in the agreement, albeit only implied." Virginia Mason Hosp., 511 F.3d at 915.

Similarly, in SFIC Properties Inc. v. International Association of Machinists, 103 F.3d 923 (9th Cir. 1996), the arbitrator inferred a "just cause" requirement before an employer could discharge an employee, even though the collective bargaining agreement did not include such a provision.  The district court vacated the award, and the Ninth Circuit reversed. The Ninth Circuit stated that "an award based on the arbitrator's understanding of industrial practices draws its essence from the collective bargaining agreement." Id. at 926.  Thus, the Ninth Circuit concluded that it was proper for the arbitrator to infer a just cause requirement based on "the broad practice of

26

inferring just cause requirements" in "arbitral jurisprudence."
Id.

This ability to look beyond the four corners of the CBA also allowed the Arbitrator to determine that, under certain circumstances, a transfer or reassignment could be a form of discipline, even though the CBA, in listing forms of discipline, does not mention a transfer or reassignment. During the arbitration proceedings, the Arbitrator heard testimony of common practices "in the shop" regarding gang seniority, and how employees were promoted to the leaderman position. From this, the Arbitrator concluded that a transfer or reassignment resulting in a loss of a subleaderman position constituted a demotion. It was the transfer coupled with the loss of the subleaderman position--not just the reassignment--that constituted a demotion in Ruiz's case.

The Arbitrator did not ignore any express provision of the CBA. He decided that certain provisions were more applicable than others and looked to shop practices to inform his interpretation of the CBA. Because the Arbitrator was applying the CBA, the court concludes that the Arbitration Award did not fail to draw its essence from the CBA.

B.   The Arbitration Award Does Not Violate Public Policy.

A court can vacate an arbitrator's award that is contrary to public policy. "[T]he question of public policy is

27

ultimately one for resolution by the courts." W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 766 (1983); see also Misco, 484 U.S. at 373.  The Ninth Circuit has cautioned that "courts should be reluctant to vacate arbitral awards on public policy grounds." Arizona Elec. Power Coop., Inc. v. Berkeley, 59 F.3d 988, 992 (9th Cir. 1995); see also Misco, 484 U.S. at 43 (there is no "broad judicial power to set aside arbitration awards as against public policy").

To vacate an arbitrator's award on public policy grounds, a court must first find an explicit, well-defined, and dominant public policy that is "demonstrated only by reference to the laws and legal precedents," and not by "general considerations of supposed public interests." Stead Motors, 886 F.2d at 1210 (internal quotations omitted); see also Foster Poultry Farms, 74 F.3d at 174.  Second, the policy must be "one that specifically militates against the relief ordered by the arbitrator." Arizona Electric Power, 59 F.3d at 992; see also Misco, 484 U.S. at 373-74.  "The party seeking to vacate the arbitration award bears the burden of showing that the arbitration award violates an 'explicit, dominant and well-defined' public policy." Foster Poultry Farms, 74 F.3d at 174 (quoting Stead Motors, 886 F.2d at 1211).

McCabe argues that the Arbitration Award "directly violates an injunction issued by a court of the State of Hawaii

28

and places McCabe in an impossible situation." Countermotion at 26-27. McCabe says that compliance with the Arbitration Award will cause McCabe to disobey the Restraining Order because "Drago will undoubtedly come within ten feet of [Ruiz] while working." Id. at 27. McCabe argues that if, on the other hand, it were to "comply with the restraining order and involuntarily transfer Drago out of Gang 56, according to the decision of Arbitrator Hunter, McCabe cannot do so without violating the terms of the CBA because such an involuntary transfer will not meet procedural and substantive requirements for taking disciplinary actions under the CBA." Id. McCabe's arguments fail. The Restraining Order does not by its terms preclude McCabe from complying with the Arbitration Award. Nor could it be said that McCabe would risk violating the Restraining Order, as McCabe is not a party restrained by that order.

The Supreme Court makes clear that obedience to judicial orders is an important policy. W.R. Grace, 461 U.S. at 766-67. For the purposes of this motion, the court assumes that the first prong of the public policy exception--whether there is a well-defined, dominant public policy demonstrated by reference to laws and legal precedents--has been met. Under the second prong, McCabe bears the burden of showing that compliance with the public policy militates against enforcement of the Arbitration Award. Courts have required evidence demonstrating

29

that compliance with the arbitration award necessarily violates a public policy.  In other words, McCabe has the burden of presenting more than hypotheticals and speculation that compliance with the Arbitration Award would violate the Restraining Order.  McCabe fails to carry its burden.

The Supreme Court has rejected an argument similar to the one McCabe makes.  In W.R. Grace, the Court upheld an arbitrator's award, despite arguments by the employer that enforcement of the award would violate public policy by requiring the employer to disobey a court order.  The employer, faced with potential Title VII claims, had entered into conciliation efforts with the Equal Employment Opportunity Commission ("EEOC").  The resulting conciliation agreement modified the seniority provisions under the collective bargaining agreement between the employer and the union.  During a strike, the employer had hired female replacements for jobs that had traditionally been held by male employees.  After the strike ended and the strikers returned to work, some male employees lost their shift preference seniority or were laid off in violation of the collective bargaining agreement's seniority provisions.  The employer's actions were taken to retain the women replacements pursuant to the conciliation agreement.  See W.R. Grace, 461 U.S. at 759-61. The employer sought an injunction in the district court prohibiting the union from grieving a violation of the collective

30

bargaining agreement, and the union counterclaimed to compel arbitration.  The district court upheld the conciliation agreement and concluded that all terms were binding on all parties.  Id. at 761.

While an appeal to the Fifth Circuit was pending, the arbitrator concluded that there was "no exception for good faith violations of the seniority provisions, and that the Company had acted at its own risk in breaching the agreement."  The arbitrator thus concluded that the district court's decision did not excuse the employer's breach of the collective bargaining agreement.  Id. at 764.

The employer moved to vacate the award.  The district court overturned the award, on the ground that enforcement of the collective bargaining agreement violated public policy.  The Fifth Circuit reversed, and the Supreme Court affirmed.

The Court noted, "It is beyond question that obedience to judicial orders is an important public policy."  However, the Court went on to say that, in the case before it, "enforcement of the collective bargaining agreement as interpreted by [the arbitrator] does not compromise this public policy."  Id. at 766-67.  The Court emphasized that it was the employer's desire to reduce its work force that had created its dilemma of complying with either the collective bargaining agreement or the conciliation agreement: "The dilemma, however, was one of the

31

Company's own making.  The Company committed itself voluntarily to two conflicting obligations. . . . In effect, [the arbitrator] interpreted the collective-bargaining agreement to allocate to the Company the losses caused by the Company's decision to follow the District Court order . . . ." Id. at 767.  The Court clarified that the arbitrator's award, ordering that the employer pay compensatory damages for its breach of the agreement, did not compel the employer to disregard the district court's order mandating compliance with the conciliation agreement.  Id. at 769.

Similarly, in Virginia Mason Hospital, the Ninth Circuit concluded that enforcement of the arbitrator's award did not require the employer to violate state or federal regulations. After finding that "staff-to-patient flu transmittal is prevalent in hospitals," the employer hospital required flu immunization as a condition of employment. Virginia Mason Hosp., 511 F.3d at 911.  The arbitrator concluded that the hospital had violated the collective bargaining agreement by failing to bargain with the nurses' union before imposing the requirement.  The arbitrator ordered the hospital to rescind its new policy.  The hospital moved to vacate the arbitrator's award, arguing that the arbitrator's decision was "contrary to public policy." Id. at 913.  The hospital pointed to state and federal regulations requiring hospitals to develop and implement procedures regarding

infection control.  See id. at 916.  The district court
disagreed, concluding that the hospital "did not show any
explicit, well-defined, and dominant public policy that was
contravened" by the award.  Id. at 913.  The Ninth Circuit
affirmed.

The Ninth Circuit was particularly concerned by the
lack of evidence demonstrating that the hospital would violate
state and/or federal regulations simply by complying with the
arbitrator's decision.

> [The hospital has not] provided any evidence
> of its inability, or the inability of peer
> institutions that do not require flu
> immunization of all employees, to comply with
> the state and federal regulatory regimes on
> infection control that it offers as its
> public policy rationale.  In other words,
> while there is little doubt that the sort of
> mandatory immunization policy that [the
> hospital] favors would enhance the aggressive
> infection control procedures and professional
> standards that state and federal regulations
> require, the hospital has not demonstrated
> that the converse is true and that the
> arbitrator's decision requiring [the
> hospital] to bargain with union
> representatives before implementing such a
> policy is directly incompatible with either
> the state and federal regulations at issue or
> the public policies underlying them.

Id.  The court recognized that, although vacating the arbitration
award might help the employer comply with state and federal
regulations, vacatur was not necessary for the employer to comply
with the health regulations.

33

Virginia Mason Hospital built on the Ninth Circuit's decision in Foster Poultry Farms.  In Foster Poultry Farms, the employer, Foster Poultry Farms ("Foster"), unilaterally implemented random drug testing of its employees to comply with regulations promulgated by the Federal Highway Administration of the Department of Transportation ("DOT").  Foster Poultry Farms, 74 F.3d at 171-72.  Under DOT regulations, Foster was required to conduct random annual drug testing on 50% of its drivers.  Any person who tested positive for drug use without showing "by clear and convincing evidence" that the "controlled substance" was medically prescribed was "medically unqualified" to operate a commercial motor vehicle.  See 49 C.F.R. §§ 391.09, 391.95(b) and (c), and 391.97.  After implementing its drug testing policy, Foster terminated the first two employees who tested positive after being randomly selected for drug testing.  The union challenged both Foster's termination of the employees as well as Foster's unilateral implementation of its drug testing program. The arbitrator concluded that Foster had violated the collective bargaining agreement and ordered Foster to reinstate the terminated employees and to rescind the drug testing program until Foster had bargained with the union.  Foster Poultry Farms, 74 F.3d at 172.  Foster moved to vacate the award, arguing that the arbitrator's decision violated public policy.  The district court confirmed the award, and the Ninth Circuit affirmed.

The Ninth Circuit concluded that Foster had failed to demonstrate that DOT regulations "specifically militate against the relief ordered by the arbitrator." Id. at 174 (quoting Stead Motors, 886 F.2d at 1212-13) (internal quotations and alterations omitted).  The Ninth Circuit noted that, although the DOT regulations prohibited employees who tested positive for drug use from driving commercial motor vehicles, the regulations did not require that such employees be automatically discharged.  Thus, the arbitrator's award was not contrary to public policy because the DOT regulations did not prohibit reinstatement of employees who had tested positive for drug use.  Foster Poultry Farms, 74 F.3d at 174.  In addition, even though DOT regulations mandated the implementation of a drug testing program, the Ninth Circuit clarified that there was no "express a public policy prohibiting employers from bargaining with unions over non-mandatory and discretionary aspects of the drug testing program." Id.

Similarly, any violation of the Restraining Order that McCabe complains of is purely hypothetical.  McCabe's decision to reassign Ruiz was not required by the Restraining Order.  As pointed out by the Union, McCabe has not established that it would be impossible for Ruiz and Drago to both remain in Gang 56 and be ten feet from each other.  See Defendant Union's Reply to McCabe's Countermotion (Aug. 7, 2008) at 8.  McCabe responds with an excerpt from the Arbitration Award stating that "gang members

work generally as a team, usually in fairly close proximity, and oftentimes in pairs or other subsets of the gang on various tasks." Plaintiff McCabe's Reply In Support of Countermotion (Aug. 8, 2008) at 5 (quoting Arbitration Award at 6). This finding, however, does not demonstrate that Ruiz and Drago would be forced to be within ten feet of each another. Employees could plausibly work in "close proximity" without being within ten feet of each another. Moreover, as there are six members in each wharf gang, it is entirely possible that Ruiz and Drago would not have to work in the same pair or subset. Like the employers in Virginia Mason Hospital and Foster Poultry Farms, McCabe did not need to take the action it took (transfer of Ruiz from Gang 56 to Gang 53) to comply with any public policy. Arbitrator Hunter's decision to overturn McCabe's decision does not necessarily conflict with enforcement of the Restraining Order.

McCabe asks leave of court to supplement its countermotion with a declaration addressing the details of how gang members work. This request appears to flow from McCabe's review of this court's prehearing inclination. See Doc. No. 21 (in this court's electronic case file). The inclination did not raise any matter not obviously already in issue. Moreover, supplementation of the record is particularly inappropriate in this case. McCabe proposes to provide evidence that was never submitted to the Arbitrator. This court is being asked to

confirm or vacate the award.  Reopening the evidence would take the court beyond its proper role.  McCabe's request to supplement its countermotion is denied.

In any event, at the hearing, McCabe conceded that there is no written or uniform policy requiring that work assignments be made in a particular manner.  It is thus plausible that the work assignments in Gang 56 can be adjusted to ensure that Ruiz and Drago do not have to work within ten feet of each other.

McCabe also contends that it must transfer Drago out of Gang 56 to comply with the Arbitration Award.  McCabe says that such a transfer would constitute disciplinary action in violation of the CBA as construed by Arbitrator Hunter.  This contention mischaracterizes the Arbitrator's decision.  The Arbitrator did not conclude that all transfers or wharf reassignments constitute discipline in violation of the CBA.  Instead, the Arbitrator's conclusion was specific to the circumstances of Ruiz's case and based on the Arbitrator's findings that McCabe's transfer of Ruiz was at least partly motivated by McCabe's disapproval of Ruiz's absenteeism, that McCabe's proffered reason that it had transferred Ruiz based on his seniority was unsupported, and that McCabe had failed to appropriately respond to Ruiz's complaints of workplace violence.  Arbitration Award at 18-19.  As such circumstances may not be present in all transfers, McCabe does

37

not show that transferring Drago out of Gang 56 would necessarily violate the CBA under the reasoning of the Arbitration Award. McCabe appears not even to have asked Drago if the preference for Gang 56 that he expressed more than five years ago remains his preference today, with the Restraining Order in place. Accordingly, McCabe has not shown that it is in an "impossible situation."

Nor is McCabe persuasive in insisting that the Arbitration Award compels McCabe to violate Haw. Rev. Stat. §§ 604-10.5 and 710-1077, which criminalize the knowing and intentional violation of a restraining order.  The Restraining Order was an injunction against Drago, not McCabe.  It is unclear how McCabe could be held in contempt for disobeying an order that restrains Drago.

Conceding at the hearing that it is not bound by the Restraining Order, McCabe says it may be facilitating its employees' violation of the Restraining Order by complying with the Arbitration Award.  While an employee forced to violate a restraining order as a result of McCabe's work assignments might sue McCabe, McCabe neither cites legal authority for this type of liability nor establishes that its employees will indeed be forced to work within ten feet of each other.  Without more, McCabe does not carry its burden in demonstrating that compliance with the Arbitration Award would violate an explicit and well-

defined public policy.  See, e.g., Virginia Mason Hosp., 511 F.3d at 916 ("Hospitals theoretically could be liable under respondeat superior or other theories of corporate negligence for the unprofessional conduct of their nurse employees, but [the employer] has [not] cited a single example of a hospital facing legal action because a patient contracted the flu from a health care worker. . . . [T]he hospital has not demonstrated . . . that the arbitrator's decision . . . is directly incompatible with either the state and federal regulations at issue or the public policies underlying them.").

Because McCabe fails to carry its burden of demonstrating that the Arbitrator's decision is directly incompatible with an explicit, well-defined public policy, the court cannot conclude that enforcement of the Arbitration Award would violate public policy.

V.      CONCLUSION.

The court grants the Union's motion to confirm the Arbitration Award and denies McCabe's countermotion to vacate the Arbitration Award.

The Clerk of Court is directed to enter judgment for the Union stating that the Arbitration Award is confirmed.  The Clerk of Court is further directed to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 21, 2008.



   /s/ Susan Oki Mollway
   Susan Oki Mollway
   United States District Judge

**McCABE HAMILTON & RENNY CO., LTD., v. INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 142, AFL-CIO**, Civ. No. 07-00512 SOM/LEK; ORDER CONFIRMING ARBITRATION AWARD.